UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────

RICHARD STRYKER,                          16-cv-9424 (JGK)

          Plaintiff,

     - against -                          **MEMORANDUM OPINION
                                          AND ORDER**

HSBC SECURITIES (USA), ET AL.,

          Defendants.
────────────────────────────────

JOHN G. KOELTL, District Judge:

     The plaintiff, Richard Stryker, brings this action pro se

against his former employers, HSBC Securities (USA), Inc., and

HSBC Bank USA, N.A. (collectively, "HSBC") and individual

defendants, Andrew Ireland, Daniel Anniello, Shalini Guglani,

and Peter Foglio. The plaintiff alleges that he was disabled by

mental illness, that the defendants discriminated against him

because of his disability, failed to accommodate the plaintiff's

mental illness, created a hostile work environment, and

retaliated against the plaintiff when he complained about the

discriminatory treatment. The plaintiff alleges violations of

the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101

et seq., the New York State Human Rights Law ("NYSHRL"), N.Y.

Exec. L. § 290 et seq., and the New York City Human Rights Law

("NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq., against HSBC and

the individual defendants.

1

The defendants move for summary judgment dismissing each of the plaintiff's claims. The plaintiff opposes the motion and has filed two notices of motion to reopen discovery, asking the Court to delay its ruling on the defendants' motion for summary judgment. For the reasons stated below, the defendants' motion is **granted in part** and **denied in part**, and the plaintiff's motions are **denied.**

## I.

The standard for granting summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. "Only

2

disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) (per curiam)); <u>see also</u> <u>Gallo</u>, 22 F.3d at 1223. Summary judgment is improper if any evidence in the record from any source would enable a reasonable inference to be drawn in favor of the nonmoving party. <u>See</u> <u>Chambers v. TRM Copy Ctrs. Corp.</u>, 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." <u>Ying Jing Gan v. City of New York</u>, 996 F.2d 522, 532 (2d Cir. 1993).

**II.**

The following facts are undisputed unless otherwise indicated.

The plaintiff is a former employee of HSBC. Defs.' 56.1 Stmt. ¶ 1. On September 8, 2015, the plaintiff began his employment with HSBC as a Premier Relations Advisor ("PRA"),

with a base salary of $75,000. Id. at ¶ 11. The plaintiff began his employment with HSBC under the name "Christopher James Vega."[1]

The individual defendants, Andrew Ireland, Daniel Anniello, Shalini Guglani, and Peter Foglio, are employees of HSBC. Id. at ¶¶ 3-6. Guglani was the plaintiff's supervisor from October 2015 until the plaintiff's termination, and Anniello was Guglani's supervisor from early 2017 until Stryker's termination. Id. at ¶¶ 3-4. Ireland was the Regional Head of Wealth at HSBC from the plaintiff's employment until January 2017, and Foglio was the Wealth Sales Coach in the plaintiff's district from the plaintiff's employment until his termination. Id. at ¶¶ 5-6.

The plaintiff's responsibilities as a PRA required him to provide financial services to "Premier clients," who were customers who met certain criteria set by HSBC, and to "acquire, develop, advise, and retain a portfolio of Premier clients." Id. at ¶¶ 28-30; Declaration of Rhonda Toft ("Toft Decl.") ¶ 12, Ex. L. The job description of a PRA states that PRAs must "work as part of an integrated branch management team" and "[c]omplete all activity documentation to provide a record for performance tracking." Toft Decl., Ex. L. Each PRA must manage a portfolio of clients initially assigned by HSBC and develop new clients

---

[1] The plaintiff changed his name from "Christopher James Vega" to "Richard Stryker" after his termination from HSBC. Defs.' 56.1 Stmt. ¶ 7.

from leads provided by HSBC management, branch personnel, and the PRA's own contacts. Defs.' 56.1 Stmt. ¶ 31. The job description states that PRAs are "assigned Premier Wealth clients and are expected to seek opportunities to attract, develop and retain these clients and expand the portfolio of clients by providing wealth, bank . . . and personal lending solutions." Toft Decl. Ex. L. The plaintiff asserts that the PRA's primary responsibility is managing a portfolio of clients assigned by HSBC. Pl.'s 56.1 Stmt. ¶ 31; Declaration of Richard Stryker ("Stryker Decl.") ¶ 19.

HSBC uses "Key Performance Indicators" ("KPIs") – Activity KPIs and Outcome KPIs, to evaluate the performance of PRAs. Defs.' 56.1 Stmt. ¶ 32. Activity KPIs include (1) Client Appointments; (2) Financial Reviews; and (3) Needs Fulfilled, whereas Outcome KPIs include (1) Net New Money; (2) Net Premier Client Growth; and (3) Recurring & Income Growth. Id. at ¶ 34. PRAs are required to submit client interactions through the "Relationship Management Platform" ("RMP"), an internal recordkeeping platform; HSBC tracks Activity KPIs solely based on data entered into the RMP by PRAs. Id. at ¶¶ 35-38. HSBC trained the plaintiff on the use of the RMP at the beginning of his employment. Id. at ¶ 39.

The plaintiff began working at HSBC's SoHo branch in September 2015, and Guglani became the plaintiff's supervisor in

5

October 2015. Id. at ¶¶ 41-42. A month later, in November 2015, Guglani transferred the plaintiff to HSBC's flagship branch so that the plaintiff could learn from more experienced PRAs and become more familiar with HSBC's system. Id. at ¶ 43. The plaintiff states that up until his transfer, Guglani and Foglio had not disciplined him in any way and that he was meeting or exceeding the position's requirements at the time. Pl.'s 56.1 Stmt. ¶ 43.

The plaintiff took a medical leave of absence from December 2015 to April 2016, but returned to work for a two-week period from late January to early February 2016. Id. at ¶¶ 46-49; Defs.' 56.1 Stmt. ¶ 47. The plaintiff testified that as of February 2016, HSBC was very understanding of his needs. Pl.'s 56.1 Stmt. ¶ 49; Declaration of C. Bryan Cantrell dated September 23, 2019 ("Cantrell Decl."), Ex. A ("Stryker Dep."). The plaintiff did not meet his Activity KPIs during the last quarter of 2015, but the plaintiff's performance was rated "Not Applicable: Too Soon" for the quarter. Pl.'s 56.1 Stmt. ¶¶ 50-51; Defs.' 56.1 Reply Stmt. ¶¶ 50-51. The plaintiff states that in February 2016, when the plaintiff was on leave, Guglani emailed HR to discuss moving the plaintiff into a "Financial Advisor" ("FA") role upon the plaintiff's return. Stryker Decl. ¶ 28, Ex. K.

Despite the plaintiff's knowledge that entering data into the RMP was a job requirement, the plaintiff did not always record interactions he had with his clients on the RMP, acknowledging that he only "sometimes" did so. Stryker Dep. at 110-12, 152-53, 320. Partially to address this problem, Foglio met with the plaintiff in May 2016, a month after the plaintiff returned to work from his first leave of absence, to review the plaintiff's performance and retrain him on the RMP system, among other things. Defs.' 56.1 Stmt. ¶¶ 52-53. The plaintiff asserts that he did input activity on the RMP, including 40 appointments and 25 financial reviews in the second quarter of 2016. Pl.'s 56.1 Stmt. ¶ 40; Stryker Decl. ¶ 7, Ex. H.

The parties dispute whether the plaintiff properly used Time Off Program ("TOP") time. After the plaintiff's return to work in April 2016, the plaintiff took two TOP days. Defs.' 56.1 Stmt. ¶¶ 54-55. At 7:32 a.m. on May 27, 2016 and 8:30 a.m. on June 8, 2016, the plaintiff notified Guglani that he was using TOP that day. Toft Decl. ¶¶ 18-19, Exs. T, U. Neither email indicates that the TOP day was taken for purposes of an emergency. The defendants argue that the TOP was improperly scheduled; HSBC has a written company policy that "TOP time must first be approved by your manager and scheduled at least by the start of the business day for which you are using TOP, or in advance, to the extent possible" and that employees may only use

7

TOP with management approval "prior to TOP time being taken, to ensure business needs and appropriate staffing levels are being met." Stryker Decl. Ex. N. The plaintiff states that these situations were emergencies and that by notifying Guglani in the morning of his need to take TOP, the plaintiff was properly following the procedures for emergency situations. Pl.'s 56.1 Stmt. ¶¶ 54-55. After each of these instances, Guglani emailed the plaintiff to discuss that TOP days must be planned, and the impact of unplanned TOP days on the business, and Guglani advised the plaintiff to contact Guglani or Ricardo in the event of an emergency. Toft Decl. ¶¶ 18-19, Exs. T-U.

From May through July 2016, Guglani received feedback from multiple sources related to the plaintiff's underperformance, including not calling clients after repeated reminders to do so, being unprofessional to other employees in the office, and arriving in the office after 11 a.m. or 12 p.m. Toft Decl. ¶¶ 20, 22, Exs. V, X. The plaintiff disputes the accuracy of the substance of the feedback, and states that the feedback was taken out of context, was an inaccurate reflection of workplace conditions, and was given by individuals not trained to give feedback. Pl.'s 56.1 Stmt. ¶¶ 56-59.

On July 25, 2016, Guglani gave the plaintiff a rating of "Off Track" in the plaintiff's 2016 mid-year review and issued the plaintiff a Written Warning for unsatisfactory performance.

Defs.' 56.1 Stmt. ¶¶ 65-66. The performance review noted that the plaintiff was "way below" expectations in generating revenue, needed to understand "the value of contacting clients with a sense of urgency," and faced "[c]hallenges with process and paperwork." Toft. Decl. ¶ 23, Ex. Y. It also noted that even with a pro-rated target number of client appointments and documented conversations because the plaintiff had taken a leave of absence, the plaintiff was "not even close" to meeting his expectations. See id. The Written Warning noted that the plaintiff had received coaching on core activity to help him reach his outcome and activity KPIs on April 7, April 26, May 27, June 1, and June 18, 2016. Id. at ¶ 24, Ex. Z. However, the plaintiff had failed to reach the outcome and activity KPI minimum standards for his position as a PRA in the second quarter. Specifically, the plaintiff had reached about 22% of his appointments, which showed very little revenue results; completed 25 financial reviews out of a minimum standard of 144; and completed three needs fulfilled out of a standard of 60 per quarter. Id. Among other things, the plaintiff needed to improve by increasing appointments, communicating with partners and clients in a timely manner, and documenting client interactions daily on the RMP. Id.

Three days after the issuance of the Written Warning, on July 28, 2016, the plaintiff wrote an email to Ireland, copying

9

Michael Pain, his supervisor at the time and a former defendant
in the case, and Guglani, alleging "unfair treatment, harassment
and discrimination . . . based on protected status, disability
and a medical leave taken earlier [that] year." Defs.' 56.1
Stmt. ¶¶ 69-70; Toft Decl. ¶ 25, Ex. AA. The plaintiff states
that he first complained about disability discrimination as
early as April 22, 2016. Pl.'s 56.1 Stmt. ¶ 60. However, on
April 22, 2016, the plaintiff emailed Guglani to ask how to
engage with clients who were shared with other advisors and did
not mention disability discrimination. Stryker Decl., Ex. P.
Other emails to which the plaintiff refers also show that the
plaintiff emailed Guglani about different ways to increase his
case load and did not mention disability discrimination. Id.

The plaintiff's internal complaint was referred for
investigation to Rhonda Toft, Vice President, Employee Relations
Specialist. Toft Decl. ¶¶ 1, 27. The plaintiff told Toft that
evidence of discrimination included having a smaller portfolio
than his peers; that his mid-year review had come only three
months after his leave of absence ended, and because three
months was not enough time to meet his goals, the review must
have been motivated by discriminatory reasons; and that Guglani
had made several comments about not giving the plaintiff a
bonus. Toft Decl. ¶ 27, Ex. BB. The plaintiff did not provide
Toft with any further evidence of his claims. Id. Toft noted in

her report that Guglani explained that the reasons for the
relatively small size of the plaintiff's client portfolio were
to allow the plaintiff to ramp up after his return and to avoid
overloading the plaintiff with a larger portfolio, which could
put other clients at risk of being improperly handled. Id.
Guglani stated that it was standard procedure for HSBC to
distribute an employee's clients when the employee took leave
and that the plaintiff's clients were not yet returned to him to
avoid disruption to the clients "due to [the plaintiff's]
underperformance." Id. Guglani identified several other
employees who took leave and were treated similarly. Id. After
conducting interviews with the plaintiff and Guglani, Toft
concluded her investigation and notified the plaintiff on August
18, 2016 that she found no evidence of discrimination due to his
leave of absence and that at no time was his leave of absence
blocked or denied. Id. Toft also concluded that the plaintiff
had "extremely low productivity," that there was "an excessive
gap between actual production and goals," and that he was
"clearly the lowest performing staff member under Ms. Guglani."
Id.

     In August 2016, other employees of HSBC reported to Guglani
instances of the plaintiff's missing client appointments and
internal meetings due to unexpected or unapproved TOP; not
showing up for work or taking long intermittent breaks

throughout the day with no communication; and not responding to emails or calls of clients or other team members. Id. at ¶ 28, Ex. CC. On August 26, 2016, the plaintiff took a second leave of absence. Id. at ¶ 29, Ex. DD. During this leave of absence, on December 6, 2016, the plaintiff commenced this lawsuit after obtaining a Notice of Right to Sue from the Equal Employment Opportunity Commission. Defs.' 56.1 Stmt. ¶ 84; Second Amended Compl. ¶ 76.

On February 2, 2017, the plaintiff reported to Guglani that he was cleared by his healthcare providers to return to work on a part-time schedule of 20 hours per week, consisting of five hours a day from Monday through Thursday, with 10 hours at the office and 10 hours at home. Toft Decl. ¶ 31, Ex. EE. The plaintiff also indicated that the healthcare provider-mandated work schedule could not be modified in any manner. Id. The accommodation request was formally submitted on February 6, 2017 and was certified by the plaintiff's psychologist. Cantrell Decl. ¶ 12, Ex. K. The psychologist stated that the plaintiff was suffering from "a major depressive episode that is part of a long-term major depressive disorder." Id. The psychologist noted that depression can affect concentration as well as promote procrastination out of fear of negative performance and/or consequences. Id. The psychologist stated that a 20-hour workweek that divides duties between home and office "should

12

allow the employee to gradually readjust to the demands of his job description." Id.

HSBC soon responded that it could not grant the plaintiff's request for compliance reasons, because HSBC had a regulatory obligation to supervise the plaintiff's sale of securities products and could not do so while the plaintiff worked from a remote location. Toft Decl. ¶ 30. The plaintiff argues that HSBC employees were able to perform significant portions of their positions' requirements from home, such as using mobile phones to communicate with clients and accessing the intranet with their laptops. Pl.'s 56.1 Stmt. ¶ 89; Stryker Decl. ¶ 61. As an alternative, HSBC offered the plaintiff (1) a change in title and role from PRA to FA; (2) change in work site from one location to four locations; and (3) 20 hours a week in the office, from Monday to Friday, 8:30 a.m. to 12:30 p.m. Stryker Decl., Ex. Y. The plaintiff communicated over the next two weeks via telephone and email with HSBC's Human Resources staff and reviewed HSBC's proposal with his healthcare providers. Id. On March 9, however, the plaintiff informed the defendants that he would return to work on a full-time schedule on March 20, pending doctor approval, and confirmed that he would not be seeking the original accommodation of a reduced number of hours. Id.

The plaintiff voluntarily returned to work full-time on
March 20, 2017. Defs.' 56.1 Stmt. ¶ 92; Toft Decl. ¶¶ 32-33, Ex.
FF. When he returned, the plaintiff was placed in an FA position
and he was assigned to four HSBC branches on a rotating weekly
schedule. Defs.' 56.1 Stmt. ¶¶ 93, 101. The plaintiff states
that he was assigned to five branches. Pl.'s 56.1 Stmt. ¶ 101.
The parties vigorously dispute whether the change of position
from PRA to FA is considered a demotion. The defendants state
that the plaintiff was placed in an FA position with the same
base salary and bonus opportunities as a PRA, that FAs perform
similar functions and are in the same HSBC "global career band"
as PRAs, and that HSBC does not consider a job change within a
global career band to be a promotion or a demotion. Defs.' 56.1
Stmt. ¶¶ 93-97. Because the plaintiff was on leave for a long
period of time, Guglani stated that she filled his position as
PRA at the 452 branch and that the FA position was the only
opportunity available in her market when the plaintiff returned
to work. Stryker Decl. Ex. A at 117-18.[2] In contrast, the
plaintiff argues that there were three other open PRA positions
at the time. Pl.'s 56.1 Stmt. ¶ 93. The plaintiff states that
being placed in an FA role was a demotion because FAs do not
manage or service banking clients and manage smaller accounts

---

[2] Because some of the exhibits submitted with the papers do not have page
numbers, all citations to page numbers in the exhibits refer to the ECF page
number included in the file stamp at the top of each page.

that generate smaller bonuses. Pl.'s 56.1 Stmt. ¶¶ 93-97. The
parties agree that the plaintiff's base salary remained the same
and that in his new capacity as an FA, the plaintiff served more
than HSBC's Premier clients and no longer carried non-securities
responsibilities. Id. at ¶¶ 93-100; Defs.' 56.1 Reply Stmt.
¶¶ 93-100.

Four days after returning to work, on March 24, 2017, the
plaintiff requested a base salary raise from $75,000 to $100,000
from Anniello. Stryker Dep., 222:7 to 222:15; Cantrell Decl.
¶ 13, Ex. L. The plaintiff forwarded this email request to
Guglani. Cantrell Decl. ¶ 13, Ex. L. Guglani promptly denied the
plaintiff's request. Defs.' 56.1 Stmt. ¶ 104. Guglani then
emailed the plaintiff on April 6, 2017, reminding him of company
policies that TOP leaves must be planned unless in case of
emergency, that the plaintiff should inform Guglani of any
doctor's appointments in advance, and that absences for medical
reasons may be covered under HSBC's leave policy. Toft Decl.
¶ 34, Ex. GG. A day later, the plaintiff took an unscheduled day
off because he was not feeling well and used TOP. Id. at ¶ 35,
Ex. HH.

The plaintiff notified Guglani on April 17, 2017 that he
intended to apply for jobs elsewhere within HSBC and asked
Guglani for a positive recommendation. Id. at ¶ 36, Ex. II.
Guglani denied the request, citing continued performance and

conduct issues, including the plaintiff's poor attendance in team huddles and collaboration, reporting late to work, lack of communication with the team during work hours, low activity levels, and missing client appointments due to taking unexcused absences. Id.

On May 1, 2017, the plaintiff had a meeting with a client at 11 a.m. at the Soho Branch, but told the banker at the branch that "I'm not going to be in SoHo for the appt if he does come in and wants to speak conf me in." Stryker Decl. Ex. GG. The plaintiff subsequently could not be reached by the banker when the client arrived. Toft Decl. ¶ 37, Ex. JJ. The next day, HSBC issued a Final Written Warning to the plaintiff. Defs.' 56.1 Stmt. ¶¶ 109-111; Cantrell Decl. ¶ 14, Ex. M. The Final Written Warning cited various reasons for corrective action, including the plaintiff's failure to attend daily morning huddles and weekly collaboration meetings; to be responsive to his team regarding his comings and goings, including extended absences at lunchtime; taking many unplanned absences; completing only two client appointments in his first 30 days of work as a Financial Advisor; and other examples of unprofessional behavior. Cantrell Decl. ¶ 14, Ex. M. It asked for immediate and sustained improvement from the plaintiff. Id.

Two days later, on May 4, 2017, the plaintiff failed to show up at his assigned branch, and Guglani attempted to reach

16

the plaintiff by phone to ask why he was not present. Defs.'
56.1 Stmt. ¶ 113. The plaintiff responded by email that he felt
threatened, harassed and intimidated by Guglani's behavior and
felt uncomfortable speaking with Guglani one on one. Toft Decl.
¶ 38, Ex. KK. Guglani emailed back to inquire why he was not at
his assigned branch. Id. Citing this incident as an immediate
defiance of the requirements of the Final Written Warning, HSBC
decided to terminate the plaintiff's employment later that day
and planned to inform him of that decision in a meeting
scheduled for 4 p.m. Defs.' 56.1 Stmt. ¶ 116. The plaintiff did
not show up at the 4 p.m. meeting; he left the branch shortly
after 3:50 p.m., when he was informed that the meeting was about
to take place. Id. at ¶¶ 119-20; Pl.'s 56.1 Stmt. ¶¶ 119-20. The
plaintiff said that he went to a different HSBC branch to finish
work for the day. Pl.'s 56.1 Stmt. ¶ 120. At that branch, he
sent an email to Guglani, Toft, Anniello, Ireland, Foglio, and
other HSBC employees with a 10-page response to the Final
Written Warning. Defs.' 56.1 Stmt. ¶¶ 121-22; Pl.'s 56.1 Stmt.
¶¶ 121-22. He also sent a second email to Guglani and Toft
informing them that he would be out of the office the next day
to begin his Core Leave, which is a two-week period of leave
that HSBC requires all employees to take each year. Defs.' 56.1
Stmt. ¶¶ 123-24; Pl.'s 56.1 Stmt. ¶¶ 123-24. In response, Toft

sent the plaintiff a copy of the termination notice. Defs.' 56.1 Stmt. ¶ 125.

### III.

The plaintiff brings claims of disability discrimination, failure to accommodate, retaliation, and hostile work environment in violation of the ADA against HSBC and in violation of the NYSHRL and the NYCHRL against all defendants.[3] The plaintiff also brings claims of aiding and abetting and employer liability in violation of the NYSHRL and NYCHRL against all defendants. The defendants move for summary judgment dismissing all of the claims.

### A. Claims against HSBC

### 1. Discriminatory Treatment Claims

The ADA makes it unlawful for an employer to discriminate "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The NYSHRL and the NYCHRL likewise prohibit discrimination against an individual because of his disability. See N.Y. Exec. Law § 296(1)(a); N.Y.C. Admin. Code § 8-107(1)(a). Employment discrimination claims brought pursuant to the ADA, the NYSHRL, and the NYCHRL are governed by the burden-

---

[3] It is not clear from the complaint under which statutes and against which defendants the plaintiff brings claims of failure to accommodate and hostile work environment. Because courts should read the pleadings of a pro se plaintiff liberally and interpret them to raise the strongest arguments that they suggest, see McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999), the Court interprets the defendants' pleadings to raise claims of failure to accommodate and hostile work environment against HSBC under the ADA, and against all defendants under the NYSHRL and the NYCHRL.

shifting standard established for Title VII claims in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013) (ADA); Spiegel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010) (NYSHRL and NYCHRL). However, courts must analyze NYCHRL claims separately from any federal and state law claims. See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013).

### a. Discriminatory Treatment Under the ADA and the NYSHRL

Under the McDonnell Douglas framework, the plaintiff must first establish a prima facie case of discrimination. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993). The ADA and the NYSHRL require the same four elements to establish a prima facie case. See Kinneary v. City of New York, 601 F.3d 151, 158 (2d Cir. 2010). The plaintiff must demonstrate that: (1) his employer is subject to the statute, (2) he suffers from a disability or is perceived to suffer from such a disability within the meaning of the statute, (3) he could perform the essential functions of the job with or without a reasonable accommodation, and (4) he suffered an adverse employment action because of his disability. See, e.g., McMillan, 711 F.3d at 125; Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 134 (2d Cir. 2008). The plaintiff's burden at the prima facie stage is

"minimal." Bucalo v. Shelter Island Union Free Sch. Dist., 691
F.3d 119, 128 (2d Cir. 2012).

If the plaintiff establishes a prima facie case, the burden
of production shifts to the defendants to articulate a
legitimate, nondiscriminatory reason for their adverse
employment action. See St. Mary's, 509 U.S. at 506-07. The
defendants' burden at this stage is "one of production, not
persuasion; it can involve no credibility assessment." Reeves v.
Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000)
(internal quotation marks and citation omitted). Finally, if the
defendants make such a showing, the plaintiff then has an
opportunity to show that the proffered reason was not the true
reason for the employment decision. See St. Mary's, 509 U.S. at
507-08. The "burden of persuading the trier of fact that the
defendant intentionally discriminated against the plaintiff
remains at all times with the plaintiff." Tex. Dep't of Cmty.
Affairs v. Burdine, 450 U.S. 248, 253 (1981); see also Reeves,
530 U.S. at 143. Ultimately, the plaintiff must "prove that
discrimination was the but-for cause of any adverse employment
action." Natofsky v. City of New York, 921 F.3d 337, 348 (2d
Cir. 2019); accord Corona v. Clarins U.S.A., Inc., No. 17-CV-
4438, 2019 WL 4393082, at *5 (S.D.N.Y. Sept. 12, 2019) (applying
the "but-for" analysis to both ADA and NYSHRL discrimination

claims); <u>Wellner v. Montefiore Medical Center</u>, No. 17-CV-3479, 2019 WL 4081898, at *8 (S.D.N.Y. Aug. 29, 2019) (same).

The first and second elements of the plaintiff's prima facie case are satisfied. The defendants do not dispute that HSBC is subject to the ADA. They also do not dispute that the plaintiff suffered from a major depressive disorder, which was "a mental impairment that substantially limit[ed] one or more major life activities" of the plaintiff. 42 U.S.C. § 12102(1)(A).

The defendants argue that the plaintiff has failed to meet the third and fourth elements of a prime facie case. They contend that the plaintiff was not qualified to perform the essential functions of his job, that he did not suffer an adverse employment action, and that if an adverse employment action was taken, it was not taken because of the plaintiff's disability.

To satisfy the third element, the plaintiff must demonstrate that he was qualified to perform the essential functions of his job. "The term 'qualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such

position." 29 C.F.R. 1630.2(m). A "reasonable accommodation may include, inter alia, modification of job duties and schedules, alteration of the facilities in which a job is performed, acquisition of devices to assist the performance of job duties, and, under certain circumstances, reassignment to a vacant position." McBride v. BIC Consumer Prod. Mfg. Co., 583 F.3d 92, 97 (2d Cir. 2009) (internal quotation marks and citations omitted).

A plaintiff need only "make the minimal showing" that the plaintiff possessed "the basic skills necessary for performance of [the] job." Gregory v. Daly, 243 F.3d 687, 696 (2d Cir. 2001) (internal citation and quotation marks omitted). The third prong of the McDonnell Douglas test should not be an opportunity for the employer to require the plaintiff to "anticipate and disprove the employer's proffer of a legitimate, non-discriminatory basis for its decision." Id. at 696-97. In this case, the employer expressed a belief that the plaintiff was minimally qualified when it hired him, and thereafter when it determined at his first review that it was too early to rate his performance. This suggests that the plaintiff has met the minimally qualified prong of the McDonnell Douglas test. See also Hardekopf v. Sid Wainer & Son, No. 02-cv-3251, 2004 WL 2199502 at *6 (S.D.N.Y. Sep. 29, 2004).

But the defendants contend that it became clear that he was not able to perform the minimal requirements of his job. There are issues of fact as to whether this is so.

The plaintiff argues that despite his disability, he was able to perform the essential functions of his job with a reasonable accommodation. In February 2017, in advance of the plaintiff's return from the second leave of absence, the plaintiff requested a reduced work schedule of 20 hours per week, evenly split on four workdays, with 10 hours spent working from home. The plaintiff provided a note from his psychologist that this accommodation "should allow the employee to gradually readjust to the demands of his job description." Cantrell Decl. ¶ 12, Ex. K. The defendants reasoned that regulatory requirements regarding the supervision of the sales of securities precluded the plaintiff's ability to work from home and HSBC provided an alternative proposal that the plaintiff work a reduced schedule of 20 hours per week from the office and that the plaintiff be placed in the FA role at different branches. However, the plaintiff disputes this reasoning and argues that there were significant portions of the job that could be performed at home. Although the plaintiff voluntarily returned to work on a full-time basis, his doctor had noted the possibility of a reasonable accommodation that could allow the plaintiff to meet the job's demands. Because there are issues of

23

fact as to whether the plaintiff could have performed the job with an accommodation such as a part-time schedule, the plaintiff has met the third element.

As to the fourth element, the plaintiff must also establish that he was subjected to an adverse employment action under circumstances giving rise to an inference of disability discrimination within the meaning of the statute. Davis v. N.Y.C. Dep't of Educ., 804 F.3d 231, 235 (2d Cir. 2015) (per curiam). To qualify as an adverse employment action, the employer's action must be "materially adverse with respect to the terms and conditions of employment" and "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Id. (citation and quotation marks omitted). Examples of materially adverse employment actions include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Sanders v. N.Y.C. Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004) (citation omitted).

The plaintiff alleges that he suffered a variety of adverse employment actions, including HSBC's (1) failure to provide him with an adequate client portfolio; (2) issuance of Written Warnings; (3) decision to "demote" the plaintiff from PRA to FA;

24

(4) refusal to increase the plaintiff's compensation and provide him with a good recommendation; (5) decision to transfer the plaintiff to five smaller branches so that the plaintiff had to commute to different locations each day; (6) failure to restore promptly the plaintiff's access to necessary software applications upon his return to work; and (7) his eventual termination. There is "no bright-line rule to determine whether a challenged employment action is sufficiently significant to serve as the basis for a claim of discrimination." Davis, 804 F.3d at 235 (internal quotation marks and citations omitted). Because it is disputed whether the change from a PRA and to a FA role was a demotion and whether there were other PRA positions open upon the plaintiff's return to work, and whether the defendants were required to provide the plaintiff with a client portfolio or if the plaintiff was expected to develop his own portfolio, these actions could constitute adverse employment actions. It is also possible that the denial of a request for an increase in compensation and a good recommendation were discretionary and that the denial of a discretionary request is an adverse employment action. See id. at 235-36 (denial of discretionary bonus could be considered adverse employment action). As the Court of Appeals explained, simply because an employer's action is discretionary does not mean that its decision can be based on racial, religious, or disability

discrimination. Id. The defendants do not contest that the
plaintiff's eventual termination constituted an adverse
employment action.

At the prima facie stage, a strong showing of temporal
proximity between evidence of a plaintiff's disability and an
adverse action can raise an inference of discrimination. See,
e.g., Hardekopf, 2004 WL 2199502, at *6; Forde v. Beth Israel
Med. Ctr., 546 F. Supp. 2d 142, 152 (S.D.N.Y. 2008) (noting that
temporal proximity on its own may be sufficient to establish an
inference of discrimination, but is insufficient to establish
pretext). The plaintiff took a second leave of absence from
August 2016 to March 2017. Immediately when he returned, many of
the adverse actions, such as the alleged demotion, change in
portfolio size, and denial of a request for increased
compensation and recommendation, took place. The closeness in
time between the defendant's return from his second leave of
absence and the alleged adverse actions against him raises an
inference of discrimination to satisfy the fourth step of the
prima facie case.

Under the second step of the McDonnell Douglas framework,
HSBC has provided legitimate and non-discriminatory reasons for
all of the alleged adverse employment actions taken against the
plaintiff. The defendants' legitimate, nondiscriminatory reasons
for the smaller size of the plaintiff's client portfolio were to

26

allow the plaintiff time to ramp up and to avoid overloading
him; this procedure was allegedly standard for all employees who
returned from leave.

Guglani, the plaintiff's supervisor, explained that the
plaintiff returned to work as a FA and not a PRA because she had
filled the plaintiff's position as a PRA when he was on leave,
and the FA position was the only opportunity available in her
market when the plaintiff returned to work.

The plaintiff's history of poor performance prior to the
plaintiff's return to work on March 20, 2017 provides
legitimate, nondiscriminatory reasons for why Guglani declined
to give the plaintiff a discretionary salary increase and
positive recommendation for another position. The plaintiff's
performance issues were documented in an Initial Written
Warning, 2016 mid-year review, and various emails. At various
points throughout the plaintiff's employment, Guglani discussed
with the plaintiff the importance of arriving to the office in a
timely fashion, communicating with other team members about the
plaintiff's whereabouts, and abiding by TOP policies. The record
reflects that the plaintiff had a variety of attendance issues.
The plaintiff missed daily team huddles and weekly collaboration
meetings, arrived at work late, and left his post without
explanation or proper communication to other branch members. The
plaintiff also used TOP days, even in the event of emergencies,

without always notifying his manager that such days were for
emergencies and without first seeking approval. In addition, the
plaintiff missed client appointments and did not contact clients
with urgency after repeated reminders to do so. The plaintiff
received a rating of "Off Track" in his 2016 mid-year review for
failing to meet minimum KPI activity, even when his target
number of client appointments was pro-rated because of his leave
of absence. The plaintiff's Initial Written Warning also noted
that the plaintiff was required to input data into the RMP, was
trained on the usage of RMP at least five times, and received
repeated reminders to document his client interaction data on
the RMP. While the plaintiff argues that he did enter data into
the RMP in the second quarter of 2016, the plaintiff admitted in
his deposition that despite being aware of this requirement, he
only "sometimes" input data into the system.

Under the third step of McDonnell Douglas, the plaintiff
has raised issues of material fact as to whether one of the
defendants' proffered reasons for the alleged demotion from PRA
to FA was a pretext for discrimination and was not the true
reason for the decision. The plaintiff argues that there were
three open PRA positions when he returned to work. Because this
is directly contradictory to what the defendants claim was the
reason for assigning the plaintiff to a FA position, the
plaintiff has raised genuine issues of material fact as to

whether Guglani's reason, namely that there were no other PRA positions available, was the true reason for why the plaintiff was allegedly demoted. See Kwan v. Andalex Group LLC, 737 F.3d 834, 847 (2d Cir. 2013) (finding that inconsistent explanations for termination coupled with proximity to evidence of protected conduct is sufficient to raise an issue of fact).

The remainder of the plaintiffs' claims fail under step three of the McDonnell Douglas test. The plaintiff has not raised any evidence that the plaintiff's reason for having a smaller portfolio upon his return from leave was a pretext. The decisions not to provide a recommendation and ultimately, to terminate the plaintiff were amply supported by the record. The record reflects that the defendants tried to accommodate the plaintiff's disability by offering a part-time work schedule. The plaintiff took two disability leaves and the defendants provided the plaintiff with multiple trainings, a mid-year review and an Initial Written Warning, followed by a final Written Warning, to try to correct various attendance issues, lack of communication, underperformance, and the plaintiff's failure to input his activity into the RMP. Only after the progressive increase in addressing ways to improve the plaintiff's performance did the defendants terminate the plaintiff after he explicitly failed to show up to work, respond to Guglani's calls, and report to the meeting in May 2017. The

plaintiff has not raised any material issue of fact that the deficiencies in his performance were not the real reasons for the other adverse employment actions that the defendants took against him.

Accordingly, the plaintiff has raised issues of material fact only as to whether the change in position from PRA to FA was a demotion such that it was an adverse employment action and whether the reason proffered by the defendants for his change in position was a pretext. For all other claims, the plaintiff has failed to show that but for his disability, the adverse employment actions would not have occurred and no reasonable jury could find that the defendants intentionally discriminated against the plaintiff.

### b. Discriminatory Treatment Under the NYCHRL

Courts should construe the NYCHRL "liberally for the accomplishment of the uniquely broad and remedial purposes thereof." Mihalik, 715 F.3d at 109. "This task is not always uncomplicated, however . . . [because there is] no specific guidance concerning how the NYCHRL should be 'construed liberally' and independently of state and federal law in its particular applications." Chauca v. Abraham, 841 F.3d 86, 87–88 (2d Cir. 2016) (emphasis in original). It is "unclear whether, and to what extent the McDonnell Douglas burden-shifting analysis has been modified for NYCHRL claims." Mihalik, 715 F.3d

at 110 n.8. However, "the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason," and an employer "is entitled to summary judgment . . . only if the record establishes as a matter of law that 'discrimination play[ed] no role' in its actions." Id. (emphasis in original); see also Corona, 2019 WL 4393082, at *6.

Although the NYCHRL has broad, remedial purposes, a plaintiff must still establish a prima facie case of discrimination under the NYCHRL. See Ya-Chen Chen v. City Univ. of New York, 805 F.3d 59, 75 (2d Cir. 2015). If the plaintiff establishes a prima facie case, the defendant has the opportunity to offer non-discriminatory legitimate reasons for its actions. If the defendant does so, summary judgment for the defendant is appropriate "if no reasonable jury could conclude either that the defendant's reasons were pretextual, or that the defendant's reasons were not its sole basis for taking action, and that its conduct was based at least in part on discrimination." Id. at 76 (internal quotation marks and citations omitted).

The more liberal standard of the NYCHRL does not alter the conclusion that the defendants offered non-discriminatory legitimate reasons for declining to provide a recommendation for the plaintiff, providing a smaller portfolio size upon the plaintiff's return from leave, and terminating the plaintiff. No

reasonable jury could find that their reasons were pretextual or that discrimination played any role in the actions the defendants took. However, because a jury could conclude that the defendant's reason for changing the plaintiff's position from PRA to FA was not the sole reason, or was a pretext for discrimination, the defendant's motion for summary judgment is **denied** with respect to that claim of disability discrimination and **granted** with respect to all other claims of disability discrimination under the NYCHRL.

Accordingly, the defendants' motion for summary judgment dismissing the plaintiff's disability discrimination claims against HSBC under the ADA, the NYSHRL, and the NYCHRL regarding the plaintiff's alleged demotion from PRA to FA is **denied.** The defendants' motion for summary judgment dismissing all the plaintiff's other claims for disability discrimination against HSBC under the ADA, the NYSHRL, and the NYCHRL is **granted.**

### 2. Failure to Accommodate Claims

Under the ADA, the NYSHRL, and the NYCHRL, a failure to accommodate claim is a theory of discrimination analyzed under the McDonnell Douglas burden-shifting framework. See 42 U.S.C. § 12112(b)(5)(A); N.Y. Exec. L. 296(3); N.Y.C. Admin. Code § 8-107(1)(a); see also Nieblas-Love v. New York City Hous. Auth., 165 F. Supp. 3d 51, 72-73 (S.D.N.Y. 2016). To establish a prima facie case based on failure to accommodate, a plaintiff must

show "that (1) plaintiff is a person with a disability under the meaning of [the relevant statute]; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." Rodal v. Anesthesia Grp. of Onondaga, P.C., 369 F.3d 113, 118 (2d Cir. 2004) (ADA); see Vangas v. Montefiore Med. Cntr., 823 F.3d 174, 180 (2d Cir. 2016) (NYSHRL); Gaughan v. Rubenstein, 261 F. Supp. 3d 390, 419 (S.D.N.Y. 2017) (NYCHRL).

The plaintiff has failed to satisfy the fourth element of a prime facie case of failure to accommodate.

### a. Failure to Accommodate Claims Under the ADA and the NYSHRL

Under the ADA and the NYSHRL, an employer is not required to provide a perfect accommodation or the accommodation most strongly preferred by the employee, but is required to provide an effective reasonable accommodation. Noll v. Int'l Bus. Machines Corp., 787 F.3d 89, 94 (2d Cir. 2015); see also Allen v. A.R.E.B.A. Casriel, Inc., No. 15-CV-9965, 2017 WL 4046127, at *8 (S.D.N.Y. Sept. 12, 2017). Where an employer has taken or offered measures to accommodate a disability, "the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is 'plainly reasonable.'" Noll, 787 F.3d at 94. To determine the appropriate reasonable

accommodation, both the employer and employee must participate in the accommodation process; the employer incurs liability only when it is responsible for the breakdown of that process. Thompson v. City of New York, No. 03-CV-4182, 2006 WL 2457694, at *4 (S.D.N.Y. Aug. 10, 2006), report and recommendation adopted, No. 03-CV-4182, 2006 WL 6357978 (S.D.N.Y. Sept. 11, 2006), aff'd sub nom. Thompson v. New York City Dep't of Prob., 348 F. App'x 643 (2d Cir. 2009).

The plaintiff cannot show that under the ADA and NYSHRL, the defendants were responsible for a breakdown of the process of determining a reasonable accommodation. After the plaintiff sought to return to work on a part-time basis, with half of his time spent working from home, HSBC proposed that the plaintiff return on the same part-time basis but without working from home. The parties then communicated over the next two weeks by telephone and email and engaged in an interactive process where the plaintiff was able to review the defendants' proposal with his healthcare providers. However, the plaintiff voluntarily returned to work on a full-time basis without pursuing his request for a part-time work schedule. Because the plaintiff voluntarily chose to return to work without seeking his accommodation, the plaintiff has failed to show that the defendants were responsible for the breakdown of any discussions. Moreover, for the same reasons discussed above, the

plaintiff has failed to show that the reasons offered by the defendants for any adverse employment action was a pretext for discrimination.

### b. Failure to Accommodate Claims Under the NYCHRL

Under the NYCHRL, the employer also has a duty to engage in an interactive process aimed at reaching a reasonable accommodation. LeBlanc v. United Parcel Serv., No. 11-CV-6983, 2014 WL 1407706, at *18 (S.D.N.Y. Apr. 11, 2014). Under the NYCHYRL, "reasonable accommodation" means broadly any "such accommodation that can be made that shall not cause undue hardship in the conduct of the [employer's] business." N.Y.C. Admin. Code § 8-102(18). The NYCHRL presumes all accommodations to be reasonable until proven otherwise; thus, the employer bears the burden of proving that the accommodation was overly burdensome or that the plaintiff could not perform the job even with a reasonable accommodation. LeBlanc, 2014 WL 1407706, at *18; see also Lazzari v. New York City Dep't of Parks & Recreation, 751 F. App'x 100, 103 (2d Cir. 2018).

HSBC has shown that it is entitled to summary judgment on the plaintiff's claim of failure to accommodate under the NYCHRL. HSBC explained why the plaintiff's proposal for working part-time at home was not reasonable and offered an alternative accommodation of part-time work at the office. The plaintiff ultimately showed the reasonableness of working at the office

when he did not pursue his alternative request for an accommodation and voluntarily returned to work at the office on a full-time basis. Under the circumstances, the plaintiff has failed to show that HSBC failed to offer a reasonable accommodation.

Accordingly, the defendants' motion for summary judgment dismissing the plaintiff's failure to accommodate claims against HSBC under the ADA, the NYSHRL, and the NYCHRL is **granted.**

### 3. Retaliation Claims

The ADA, the NYSHRL, and the NYCHRL prohibit an employer from retaliating against an employee for opposing discriminatory conduct prohibited by the statutes. See 42 U.S.C. § 12203(a); N.Y. Exec. Law § 296(7); N.Y.C. Admin. Code § 8-107(7). Claims under the ADA and the NYSHRL statutes are analyzed under the same three-part McDonnell Douglas framework that governs the plaintiff's discrimination claims, although claims under the NYCHRL require a more liberal analysis. See, e.g., Fox v. Costco Wholesale Corp., 918 F.3d 65, 71 (2d Cir. 2019) (ADA and NYSHRL); Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 361 (S.D.N.Y. 2012) (NYSHRL and NYCHRL).

#### a. Retaliation Claims Under the ADA and the NYSHRL

To establish a prima facie case of retaliation under the ADA and the NYSHRL, the plaintiff must show that (1) he participated in a protected activity, (2) the employer was aware

36

of that activity, (3) the employer took an adverse employment action against the plaintiff, and (4) there was a "causal connection" between the protected activity and the adverse employment action. Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002). In the context of retaliation claims, adverse employment actions include any actions that "could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination." Davis-Garett v. Urban Outfitters, Inc., 921 F.3d 30, 43-44 (2d Cir. 2019) (citation omitted).

The plaintiff has established the first three elements of his prima facie case. For the first element, "[e]mployees engage in protected activity when they have a good faith, reasonable belief that they have made a complaint opposing an employment practice made unlawful by . . . the ADA." Salas v. New York City Dep't of Investigation, 298 F. Supp. 3d 676, 685 (S.D.N.Y. 2018) (citation and quotation marks omitted); see also Woldeselassie v. Am. Eagle Airlines/Am. Airlines, No. 12-CV-07703, 2015 WL 456679, at *8 (S.D.N.Y. Feb. 2, 2015) (discussing protected activities under the ADA and the NYSHRL). The plaintiff initially complained to the defendants about disability discrimination on July 28, 2016 and initiated this lawsuit in December 2016. These activities constitute protected activities under the ADA and the NYSHRL. Second, the defendants were aware of the plaintiff's complaint and lawsuit. Third, the

plaintiff alleges that in retaliation to his complaint and lawsuit, the defendants took substantially the same adverse actions against him as he alleged in his discrimination claim under the ADA and NYSHRL. Under the broader definition of adverse employment action for retaliation claims, nearly all of the plaintiff's allegations could qualify as adverse employment actions.

The plaintiff argues that the temporal proximity between his protected activities and adverse employment actions against him demonstrate causation. While a plaintiff "can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action," Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010), the temporal proximity must be "very close." Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001). Courts have found that one year was "too long a period of time for a jury to be able to infer a causal connection," Natofsky, 921 F.3d at 353, and that "[s]ix months between protected activity and discharge is well beyond the time frame for inferring retaliatory causation." Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005).

The plaintiff has failed to show a causal connection between the protected activity and many of the adverse

employment actions, namely, his client portfolio size, Written Warnings, refusal to increase compensation, and termination. The plaintiff first complained about discrimination in July 2016 only after he was given a Written Warning based on his poor performance. However, the defendants still allowed the plaintiff to take a second leave of absence from August 2016 until March 2017. In December 2016, when the plaintiff was on leave, he filed this lawsuit. The defendants did not terminate the plaintiff until May 2017, nearly one year after he initially complained about discriminatory conduct and five months after he filed the current lawsuit.

Furthermore, the plaintiff had a history of performance and attendance issues, which the defendants had already documented and notified the plaintiff of in emails, a mid-year review, and an Initial Written Warning before the plaintiff made his initial complaint in July 2016. "[W]here the adverse action was already ongoing at the time of the protected activity, or is very similar to another adverse action that was taken before the protected activity, with no other change in relevant circumstances, logic precludes any inference of causation." Young v. Westchester Cty. Dep't of Soc. Servs., 57 F. App'x 492, 495 (2d Cir. 2003); see also Hazelwood v. Highland Hosp., 763 F. App'x 60, 63 (2d Cir. 2019) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began

39

well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.") (quoting Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001)); Mucciarone v. Initiative, Inc., No. 18-CV-567, 2020 WL 1821116, at *14 (S.D.N.Y. Apr. 10, 2020) (collecting cases). The defendants' actions against the plaintiff after his complaint were the same as conduct before his complaint; the defendants continued to offer training and discuss the plaintiff's obligations to enter data into the RMP system, discuss the importance of receiving approval for taking TOP, explain that the plaintiff needed to communicate with his team as to his whereabouts, arrive to work on time, and increase communication and outcomes with his clients. Even after the plaintiff complained about discrimination he was facing because of his disability and medical leave, the defendants permitted him to take a second leave of absence. While the plaintiff's termination was different in kind from prior actions involving the plaintiff, it was in direct response to his failure to abide by the final warning, which was itself the culmination of measures which had begun before the plaintiff complained about alleged discrimination.

Moreover, for substantially the same reasons as stated above with respect to the plaintiff's disability discrimination claims, the plaintiff has failed to show that the defendants'

legitimate reasons for the plaintiff's smaller client portfolio size, for issuing Written Warnings, for refusing to increase compensation or provide a recommendation, and for terminating the plaintiff, were a pretext for discrimination, as required under the final steps of the McDonnell Douglas analysis.

However, changing the plaintiff's role from PRA to FA occurred immediately after the plaintiff returned to work such that the temporal proximity between the adverse action and protected activity creates an inference of a causal connection. Although the defendant states that the reason the plaintiff was placed in an FA position was because there were no other positions available, the plaintiff has raised an issue of material fact as to whether there were three other PRA positions open at the time. Accordingly, the defendants' motion for summary judgment is **denied** as to the plaintiff's retaliation claim against HSBC under the ADA and NYSHRL, solely with respect to the change in the plaintiff's position from PRA to FA. The motion to dismiss the other claim of retaliation against HSBC is **granted.**

### b. Retaliation Claims Under the NYCHRL

"[T]he retaliation inquiry under the [NYCHRL] is 'broader' than its federal counterpart." Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 723 (2d Cir. 2010) (citing Williams v. New York City Hous. Auth., 872 N.Y.S.2d 27, 34 (App.

Div. 2009)). "[T]o prevail on a retaliation claim under the
NYCHRL, the plaintiff must show that [he] took an action
opposing [his] employer's discrimination, and that, as a result,
the employer engaged in conduct that was reasonably likely to
deter a person from engaging in such action." Mihalik, 715 F.3d
at 112 (internal citation omitted).

Applying a more lenient standard, the plaintiff's
retaliation claim under the NYCHRL for the adverse employment
actions of his client portfolio size, Written Warnings, refusal
to increase compensation, and termination, also fails because it
suffers from the same defects as his retaliation claim under the
ADA and the NYSHRL. Because the plaintiff's performance issues
were present before his protected activities began and because
the defendants disciplined the plaintiff progressively, the
plaintiff has not satisfied his burden under the NYCHRL to
demonstrate that retaliation was a motivating factor in these
adverse employment actions.

However, because there is a disputed material fact under
the stricter standard applicable under the ADA and the NYSHRL,
the plaintiff has also established a genuine issue of material
fact on his retaliation claim related to the adverse action of
changing the plaintiff's role from PRA to FA. Therefore, the
defendants' motion for summary judgment dismissing the
plaintiff's retaliation claims under the NYCHRL is **denied** solely

with respect to the plaintiff's change of position from PRA to FA and **granted** with respect to all other claims of retaliation under the NYCHRL.

Accordingly, the defendants' motion for summary judgment dismissing the plaintiff's retaliation claims against HSBC under the ADA, the NYSHRL, and the NYCHRL regarding the plaintiff's alleged demotion from PRA to FA is **denied.** The defendants' motion for summary judgment dismissing all the plaintiff's other claims against HSBC for retaliation under the ADA, the NYSHRL, and the NYCHRL is **granted.**

### 4. Hostile Work Environment Claims

#### a. Hostile Work Environment Claims Under the ADA and the NYSHRL

A hostile work environment claim is cognizable under the ADA and the NYSHRL. See <u>Fox</u>, 918 F.3d at 73-74 (ADA); <u>Viruet v. City of New York</u>, No. 16-CV-8327, 2019 WL 1979325, at *17 (S.D.N.Y. May 3, 2019) (standard for demonstrating a hostile work environment the same under the ADA and NYSHRL). To succeed on a hostile work environment claim, the plaintiff must show that "(1) that the harassment was 'sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer." <u>Fox</u>, 918 F.3d at 74 (quoting <u>Alfano v. Costello</u>, 294 F.3d 365,

373 (2d Cir. 2002)). Furthermore, the workplace must be "so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [the employee's] employment were thereby altered." Alfano, 294 F.3d at 373. Courts look to "the totality of the circumstances to determine whether a plaintiff has met this burden, including proof of the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with [the plaintiff's] work performance." Fox, 918 F.3d at 74 (internal quotation marks and citation omitted); see also Berger v. New York City Police Dep't, 304 F. Supp. 3d 360, 373 (S.D.N.Y. 2018).

The plaintiff cannot meet the standard under the ADA and the NYSHRL. The plaintiff states that he felt threatened, harassed, and intimidated by Guglani. However, Guglani's behavior as the plaintiff's supervisor, including providing him Written Warnings and discussions about his underperformance, are not abusive or hostile. "Legitimate reprimands by an employer are not abuse. Nor are the disciplinary actions taken against [the plaintiff] in response to complaints . . . evidence" of hostile work environment. Fox, 918 F.3d at 75. Furthermore, the defendants allowed the plaintiff to take two leaves of absence within the plaintiff's first year of employment and provided the

plaintiff with multiple different types of training and feedback upon his return. There is no evidence of physically threatening or humiliating actions against the plaintiff. And, unlike in Fox, there is no evidence that co-workers engaged in ongoing and pervasive comments mocking the plaintiff's disability. For the reasons discussed above, the plaintiff has also not shown that any of the actions taken against him were based on his disability.

### b. Hostile Work Environment Claims Under the NYCHRL

The standard for establishing a hostile work environment is more permissive under the NYCHRL, and requires a plaintiff to demonstrate only "by a preponderance of the evidence that [he] has been treated less well than other employees because of [his disability]." Berger, 304 F. Supp. 3d at 373 (internal quotation marks omitted). The plaintiff points to no evidence supporting his claim that he was treated less well than other similarly-situated employees because of his disability. For example, the plaintiff has not shown that giving employees returning from leave a smaller portfolio was anything other than standard procedure, to allow employees time to ramp up their activity.

Accordingly, the defendants' motion for summary judgment dismissing the plaintiff's hostile work environment claims against HSBC under the ADA, the NYSHRL, and the NYCHRL is **granted.**

45

### 5. Other State and Municipal Law Theories of Liability

The plaintiff also alleges that HSBC should be held liable under an aiding and abetting theory of liability in violation of the NYSHRL and the NYCHRL and under a theory of employer liability in violation of the NYCHRL.

The NYSHRL makes it unlawful for an employer to discriminate on the basis of disability. <u>See</u> N.Y. Exec. Law § 296(1). The NYSHRL also makes it "an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." N.Y. Exec. Law § 296(6).

The NYCHRL also supports claims for aiding and abetting, which are "susceptible to the same standard as under the NYSHRL, as the language of the two laws is virtually identical." <u>Schanfield v. Sojitz Corp. of Am.</u>, 663 F. Supp. 2d 305, 344 (S.D.N.Y. 2009) (internal quotation marks and citation omitted) (collecting cases). The NYCHRL also holds employers liable for its employee's or agent's unlawful discriminatory conduct. <u>See</u> N.Y.C. Admin. Code § 8-107(13).

Because the plaintiff has raised genuine issues of material fact as to whether HSBC and its employees discriminated and retaliated against the plaintiff for engaging in protected activity by allegedly assigning him to an FA position rather than a PRA position, the plaintiff's claims of aiding and

abetting liability and employer liability against HSBC cannot be decided on this motion for summary judgment. The defendants' motion for summary judgment dismissing these ancillary claims under the NYSHRL and the NYCHRL against HSBC with respect to the change in position from PRA to FA is thus **denied.**[4]

### B. Claims Against Individual Defendants

The plaintiff alleges that the individual defendants should be held liable under the NYSHRL and the NYCHRL for disability discrimination, retaliation, failure to accommodate, and hostile work environment.[5] The plaintiff alleges that the individual defendants are liable on a direct theory and an aiding and abetting theory.

Individual liability under the NYSHRL is limited to individuals who are owners or supervisors. See Malena, 886 F. Supp. 2d at 365-66. "A supervisor is an employer for purposes of establishing liability under the NYSHRL if that supervisor

---

[4] In Count Six of the Amended Complaint, the plaintiff alleged that the defendants violated Section 8-107(19) of the NYCHRL. The parties do not discuss this claim in their briefs. In any case, "[t]hreats are required to state a claim for violation of Admin Code § 8-107(19)." Nieblas-Love, 165 F. Supp. 3d at 78 (citation omitted). The plaintiff has not presented evidence of any threats he received from HSBC or any of the individual defendants, or that any such threats were aimed at intimidating or interfering with the plaintiff's exercise of a protected right. Accordingly, this claim against HSBC and the individual defendants is dismissed.

[5] To the extent that the plaintiff intended to bring any claims against individual defendants under the ADA, those claims are dismissed because the ADA does not provide for individual liability. See Cerrato v. Durham, 941 F. Supp. 388, 395 (S.D.N.Y. 1996) (discrimination claims); Spiegel, 604 F.3d at 79 (retaliation claims); O'Hara v. Bd. of Coop. Educ. Servs., S. Westchester, No. 18-CV-8502, 2020 WL 1244474, at *11 (S.D.N.Y. Mar. 16, 2020) (dismissing discrimination, retaliation, and hostile work environment claims under the ADA against individual defendants).

actually participates in the conduct giving rise to the discrimination." Feingold v. New York, 366 F.3d 138, 157 (2d Cir. 2004) (alteration, internal quotation marks, and citation omitted).

Individual liability under the NYCHRL is applicable to all employees and is not limited to supervisors. Under the NYCHRL, it is unlawful for "an employer or an employee or agent thereof, because of the actual or perceived . . . disability . . . to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a). However, an individual may be held personally liable under the NYCHRL only if that person participates in the conduct giving rise to the discrimination. See Schanfield, 663 F. Supp. 2d at 344.

For the same reasons that HSBC was not liable for the plaintiff's failure to accommodate and hostile work environment claims under the NYSHRL and the NYCHRL, the individual defendants are also not liable for these claims. The plaintiff failed to establish a prima facie case of failure to accommodate and failed to show any actions that rose to the level of a hostile work environment. See Woldeselassie, 2015 WL 456679, at *12 (no supervisory liability when the plaintiff failed to show discriminatory conduct in the first place).

The plaintiff's claims of aiding and abetting liability are also not viable against the individual defendants for the plaintiff's failure to accommodate and hostile work environment claims, because there was no underlying discriminatory conduct. "Where no violation of the Human Rights Law by another party has been established . . . an individual employee cannot be held liable for aiding or abetting such a violation." Bliss v. MXK Rest. Corp., 220 F. Supp. 3d 419, 426 (S.D.N.Y. 2016) (quoting Strauss v. N.Y. State Dept. of Education, 805 N.Y.S.2d 704, 709 (App. Div. 2005) (alteration omitted)).

However, the plaintiff has raised genuine issues of material fact as to the discrimination and retaliation claims regarding his alleged demotion from a PRA to FA. Because the plaintiff argues that only Guglani was involved in his alleged demotion, the motion for summary judgment on the plaintiff's NYSHRL and NYCHRL claims for direct liability and aiding and abetting for the plaintiff's discrimination and retaliation claim is **denied** solely as to defendant Guglani and solely with respect to the alleged demotion from PRA to FA.[6] The motion for

---

[6] To the extent that the plaintiff also brought claims of employer liability against the individual defendants under the NYCHRL, these claims are dismissed. It is not clear that any of the individual defendants are considered employers under the NYCHRL, and in any event, the plaintiff has failed to show any unlawful discriminatory conduct by any of the individual defendants other than Guglani. See N.Y.C. Admin. Code § 8-107(13).

summary judgment dismissing all claims under the NYSHRL and the NYCHRL against all other individual defendants is **granted**.

### IV.

The plaintiff has also filed two notices of motion to reopen discovery pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, asking the Court to delay its ruling on the defendants' motion for summary judgment to allow the plaintiff time to obtain affidavits or to take discovery. The text of both notices of motion are the same, but the second motion also attached a declaration in support of the motion to reopen discovery. Dkt. Nos. 227, 233.

### A.

Federal Rule of Civil Procedure 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

The plaintiff's motions to reopen discovery are unfounded. Discovery for this case was originally scheduled to be completed by August 31, 2018. Dkt. No. 81. The Court extended the deadline for discovery five times at the parties' request, until March 27, 2019, over six months after the original date. Dkt. Nos.

50

109, 115, 154, 158, 169. During a pre-motion conference on October 9, 2018, the plaintiff argued to Magistrate Judge Kevin Nathaniel Fox that the defendants had failed to provide the specific discovery documents that he now seeks. Dkt. No. 117, 2:8-6:2. The Magistrate Judge decided that such a dispute should be resolved in the form of a formal motion to compel and asked the plaintiff how quickly he could file that motion. Id. at 6:19-7:9. The plaintiff responded: "In about a week's time, Your Honor." Id. at 7:10. Therefore, the Magistrate Judge set October 16, 2018 as the filing deadline for the plaintiff's motion to compel. Id. at 7:10-12. The Magistrate Judge reemphasized the reason he was asking the plaintiff to file a formal motion at the end of the telephone conference and asked if the plaintiff had any other issue that needed to be addressed. Id. at 11:25-12:6. The plaintiff responded that he understood the requirement and that there was nothing more from him. Id. 12:7-11. The plaintiff did not file the motion to compel until November 1, 2018. That date was over two weeks later than his self-imposed schedule, and the Magistrate Judge denied the plaintiff permission to file the late motion at a conference on November 6, 2018, Dkt. No. 128 at 6-7, and struck the motion from the record on November 8, 2018, Dkt. No. 127.

The information that the plaintiff now seeks is the same information that he sought in the motion that the Magistrate

Judge struck from the record almost two years ago. In the
current motions, the plaintiff seeks to obtain the value and
details of his portfolio and that of similarly situated
employees; the personnel folders for each of the individual
defendants and the plaintiff's former manager; disciplinary
records of any similarly situated employees; and all email and
phone communications of the plaintiff within the defendants'
possession. In the previous motion, the plaintiff similarly
sought his portfolio data; personnel records of each individual
defendant; discipline records of all advisors; and the
plaintiff's phone and email records. Declaration of C. Bryan
Cantrell dated December 23, 2019 ("Second Cantrell Decl."), Ex.
A. The plaintiff is attempting to relitigate an issue that was
decided against him by the Magistrate Judge and which he failed
to appeal.

The plaintiff now argues that his inexperience at drafting
a motion to compel, his grief due to family issues, and the
volume of information withheld by the defendants caused his late
filing. But as the Magistrate Judge explained in a telephone
conference held on November 6, 2018 regarding the motion, these
reasons were known to the plaintiff when he provided his own
filing deadline during the October 9, 2018 conference, but the
plaintiff never raised them. Dkt. No. 128, 6:25-7:12. The
ultimate obligation to follow deadlines, especially when that

deadline was self-imposed, rests with the parties involved;
failure to do so carries consequences for the parties,
regardless of their pro se status. See, e.g., Jonas v. Citibank,
N.A., 414 F. Supp. 2d 411, 417 (S.D.N.Y. 2006).

Now, long after the close of an extended discovery period,
the plaintiff attempts to relitigate a discovery issue already
resolved by the Magistrate Judge over a year ago.[7] There is no
basis to overturn the Magistrate Judge's previous ruling.

---

[7] On November 14, 2018, the plaintiff filed a motion to reconsider the
Magistrate Judge's decisions of various motions including the Magistrate
Judge's denial of the plaintiff's motion to compel discovery. Dkt. No. 134.
In an order dated December 7, 2018, Dkt. No. 146, the Magistrate Judge struck
various discovery filings by the plaintiff which appeared to be contrary to
the rulings that the Magistrate Judge had made at the November 6, 2018
conference, including the Magistrate Judge's denial of the plaintiff's
request to file the plaintiff's motion to compel beyond the plaintiff's self-
imposed deadline of October 16, 2018. Included in the stricken documents were
Docket No. 133 (notice of motion to compel the defendants "to answer written
discovery" and for sanctions) and Docket No. 135 (memorandum of law in
support of the motion to compel and for sanctions). While the Magistrate
Judge did not explicitly deny or strike the motion for reconsideration, Dkt.
No. 134, the gist of the Magistrate Judge's Order was to deny the plaintiff's
requests to contest the discovery rulings that the Magistrate Judge made at
the November 6, 2018 conference. In any event, there was no basis for
reconsideration of the Magistrate Judge's ruling denying the plaintiff's
application to make a discovery motion beyond the deadline that the plaintiff
had himself suggested. The Magistrate Judge's decision denying the
plaintiff's application was well within the exercise of the Magistrate
Judge's discretion in managing discovery. See, e.g., Thai Lao Lignite
(Thailand) Co. v. Gov't of Lao People's Democratic Republic, 924 F. Supp. 2d
508, 511 (S.D.N.Y. 2013) (noting that Magistrate Judges are afforded broad
discretion in resolving nondispositive disputes, including discovery
disputes); Sea Trade Mar. Corp. v. Coutsodontis, No. 9-CV-488, 2020 WL
2747307, at *5 (S.D.N.Y. May 27, 2020) ("It was well within [the Magistrate
Judge's] authority to determine that additional discovery was unnecessary to
ensure the fair and efficient resolution of [the] matter.").

Reconsideration of a previous Opinion of the Court "is an extraordinary
remedy to be employed sparingly in the interests of finality and conservation
of scarce judicial resources." Sigmon v. Goldman Sachs Mortg. Co., 229 F.
Supp. 3d 254, 257 (S.D.N.Y. 2017) (citation omitted). To succeed on a motion
for reconsideration, the movant carries a heavy burden. The movant must show
"an intervening change of controlling law, the availability of new evidence,
or the need to correct a clear error or prevent manifest injustice." Id.

**B.**

Moreover, the plaintiff has failed to carry the heavy burden imposed on parties opposing summary judgment on Rule 56(d) grounds. In these cases, the party raising the motion "must submit an affidavit showing (1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir. 1999) (internal quotation marks and citations omitted). The material sought must be "neither cumulative nor speculative", and "a bare assertion that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient." Paddington Partners v. Bouchard, 34 F.3d 1132, 1138 (2d Cir. 1994) (internal citation and quotation marks omitted).

The plaintiff has failed to show how the facts he seeks create a genuine issue of material fact. The plaintiff also has failed to show that the discovery he seeks provides evidence that the defendants carried out adverse employment actions

---

(internal quotation marks and citations omitted). "A motion for reconsideration is not an 'opportunity for making new arguments that could have been previously advanced . . . .'" Liberty Media Corp. v. Vivendi Universal, S.A., 861 F. Supp. 2d 262, 265 (S.D.N.Y. 2012) (quoting Associated Press v. U.S. Dep't of Def., 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005)). The plaintiff has failed to show that there was any basis for reconsideration of the Magistrate Judge's prior discovery ruling.

because of his disability or in retaliation for his protected activity. The defendants have responded to the size of the plaintiff's portfolio directly, explaining that because the plaintiff was already struggling with a small client base, adding more customers to the portfolio would risk overloading the plaintiff. Defs.' 56.1 Stmt. ¶ 76. As discussed above, the plaintiff's performance and attendance issues were well-documented throughout the record. Consequently, the plaintiff has not established that additional information would enable him to establish a prima facie case under the McDonnell Douglas burden-shifting framework or that the legitimate reasons for the adverse employment actions the plaintiff received, which included the plaintiff's continued underperformance and attendance issues, were a pretext for discriminatory behavior. Accordingly, the plaintiff's motions to reopen discovery are **denied.**

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the reasons stated above, the defendants' motion for summary judgment dismissing the claims against HSBC is **granted** as to the failure to accommodate and hostile work environment claims and is **denied** as to the discrimination and retaliation claims and claims of aiding and

abetting and employer liability solely with respect to the claim of alleged demotion from a PRA to FA under the ADA, the NYSHRL, and the NYCHR. Any ADA claims against the individual defendants are dismissed. The defendants' motion for summary judgment dismissing the claims against the individual defendants under the NYSHRL and the NYCHRL is **granted** as to all claims against the individual defendants Ireland, Anniello, and Foglio; it is **granted** as to the failure to accommodate and hostile work environment claims and **denied** as to the discrimination retaliation claims and claims of direct and aiding and abetting liability under the NYSHRL and the NYCHRL against the individual defendant Guglani solely with respect to the claim of alleged demotion from PRA to FA. The plaintiff's motions to reopen discovery are **denied.** The Clerk is directed to close all pending motions.

**SO ORDERED.**

Dated:     **New York, New York**
          **August 31, 2020**           **/s/ John G. Koeltl**
                            **John G. Koeltl**
                   **United States District Judge**